Filed 6/10/16  P. v. Tschida CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067262 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE326600) |
| CASEY MICHAEL TSCHIDA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Lantz Lewis, Judge.  Affirmed.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Meagan J. Beale and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

Casey M. Tschida appeals a judgment following his jury conviction of one count of first degree murder (Pen. Code, § 187, subd. (a))[1] and true findings on allegations that he committed the murder while lying in wait (§ 190.2, subd. (a)(15)) and personally discharged a gun, causing death (§ 12022.53, subd. (d)). On appeal, he contends: (1) the trial court erred by instructing with CALCRIM No. 625 on voluntary intoxication without modifying it to address the lying in wait allegations; (2) the court erred by admitting evidence of his bad character; (3) the prosecutor committed prejudicial error or misconduct in cross-examining him and misstating the law in closing argument; (4) the court erred by not holding a *Marsden*[2] hearing when shortly before the jury returned its verdict he complained about his counsel's pretrial preparation; and (5) the cumulative prejudice from multiple errors denied him a fundamentally fair trial.

FACTUAL AND PROCEDURAL BACKGROUND

On November 26, 2012, Tschida purchased a handgun and two semiautomatic rifles at a La Mesa firearms store. Because the handgun did not have an external safety, it could be fired if a person's finger was firmly placed on the trigger and there was a round in the chamber. Tschida passed the handgun safety test and, after a 10-day waiting period, picked up the firearms.

In late November or early December 2012, Tschida met Jennifer Krajnak at Dirk's Niteclub in Lemon Grove. She seemed interested in him at times and he pursued a dating

---

[1]    All statutory references are to the Penal Code unless otherwise specified.

[2]    *People v. Marsden* (1970) 2 Cal.3d 118.

relationship with her. They occasionally exchanged phone calls and text messages. On December 22, responding to a text message from Krajnak, Tschida wrote: "I get what was meant by goober now, and why my gut told me to take insult to it. I will never stand by 4 that kind of treatment!!!!!!"

On January 2, 2013, Krajnak sent Tschida a text message asking him to meet her for shots. At about 10:30 p.m., he went to Dirk's, parking his truck in the GTM Store's lot across the street. He and Krajnak appeared to be having a good time together. Krajnak drank five or six beers and Tschida drank five or six glasses of Crown Royal and Coke. As they walked outside to smoke a cigarette, Krajnak bumped into Jeanette Malanga, who was playing pool. Krajnak apologized to her and continued walking with Tschida. On their return, Tschida approached Malanga and told her, "I heard you say that you were going to hit me on the head with a pool cue." Tschida and Malanga argued, but their argument was quickly broken up.

After that incident, Tschida and Krajnak started bickering and she called him an asshole. When he offered to buy her drink, she replied, "I don't want anything from you. That's why you don't have a girlfriend, because you're an asshole." Tschida left the bar, got in his truck, and drove toward his house, about one and one-half miles away.

Because Krajnak appeared very agitated and upset, Clyde Stevenson, her friend, asked her if she was all right. She replied she was okay and not to worry. He offered her a ride home, but she said she wanted to walk. She was staying with a friend at the Olive Tree Apartments, about one block from Dirk's.

3

Six and one-half minutes after he left, Tschida drove his truck back to the area, parking in a lot next to the Olive Tree Apartments. Tschida waited there for Krajnak. His truck remained parked in the same place for seven and one-half minutes. At Dirk's closing time, Krajnak left and walked toward her apartment, carrying an electronic tablet. At about 1:46 a.m., Tschida got out of his truck with a handgun in his waistband and approached Krajnak. He shot her in the left side of her head.

After shooting Krajnak, Tschida got back in his truck and began driving with his truck's headlights off. He stopped near Krajnak's body, took her tablet from her hands, and wiped it clean of fingerprints. He got back in his truck and drove away. At about 2:00 a.m., two San Diego Sheriff's deputies found Krajnak, still alive, lying in the street. She died shortly thereafter as a result of a single gunshot wound to the left side of her head fired within inches of her head.

Tschida drove to his house, got his dog, and packed up his firearms and other belongings. He drove north and discarded his cell phone so that he could not be tracked. He arrived at his mother's house in Happy Valley, Oregon, about 1,091 miles from his house.

On January 5, 2013, Portland police took Tschida into custody. When San Diego homicide detectives arrived in Oregon and introduced themselves to Tschida, he replied: "For the murder of who[m]?"

During a search of his truck, officers found two rifles, a shotgun, and a long gun. A rifle and the shotgun were loaded. A large amount of various types of ammunition was

4

also found.[3]  Officers found Krajnak's blood on the driver's side armrest door handle of Tschida's truck.  During a search of Tschida's home, officers found six .38 caliber bullets, a laptop computer, gun cleaning supplies, manuals for two firearms, and a rifle scope.

One and one-half months later, a Smith and Wesson handgun was found in the Willamette River in Oregon.  An expended 9 mm firearm casing found near Krajnak's body was fired from that gun.  A minimum of six and three-fourths pounds of weight was required on the trigger to fire the gun.

An information charged Tschida with one count of murder (§ 187, subd. (a)) and alleged that in committing the murder he personally discharged a firearm and caused great bodily injury and death to a person (§ 12022.53, subd. (d)).  A subsequent amended information added a special circumstance allegation that Tschida committed the murder by means of lying in wait (§ 190.2, subd. (a)(15)).

At trial, the prosecution presented evidence substantially as described above. Tschida testified in his defense.  He testified he served eight years in the Navy and served time in Iraq.  After leaving the Navy, he worked for a civilian contractor as a helicopter mechanic.  In October 2012, his divorce from his second wife was finalized.  In late November, he decided to buy more guns because he no longer had children living with him.  He had experience with guns during his time in the Navy and, after leaving the Navy, enjoyed target shooting with friends. He carried the handgun he purchased with

---

3    Officers found over 331 shotgun shells, 382 .223 caliber cartridges, over 800 nine-millimeter cartridges, 142 .357 and .38 cartridges, and 480 5.565 millimeter cartridges.

him at all times, except at work, after an intoxicated stranger threatened him with a gun. On the night of January 2, 2013, he had the gun in his possession.

Tschida testified he met Krajnak at Dirk's Niteclub and asked her out on a date. She declined because she had a boyfriend. After Krajnak broke up with her boyfriend, she and Tschida went out on a date and he pursued a dating relationship with her. In December, they went to Dirk's, but Krajnak began flirting with another man. Tschida got angry, confronted the man, and later told Krajnak to never call him again.

In late December, Krajnak sent Tschida a "Merry Christmas" text and he decided to resume contact with her. He wanted a romantic relationship with her and she knew it.

On January 2, 2013, Tschida was depressed and lonely. Krajnak sent him a text asking him to meet her for shots. He drove to Dirk's, parking across the street, and met Krajnak inside. Things went well between them at first, but changed after Krajnak bumped into a pool player. The pool player said she was going to "smack a cue ball over that bitch's head." Tschida thought he was defending Krajnak's honor by having words with the pool player, but Krajnak became upset with him and called him a jerk. Wanting to insult her, Tschida told Krajnak she had "giz" on her shirt. Krajnak told him the reason he did not have a girlfriend was because he tried too hard. Feeling woozy, Tschida left the bar and got into his truck. He testified he drank more than six mixed drinks that night. The bartender joked he must have drunk an entire fifth of Crown Royal or Captain Morgan. Tschida felt wobbly, had blurry vision, and believed he was drunk. As he drove past a sheriff's substation, he realized he was too drunk to drive. Thinking he might throw up, he pulled over and stood outside his truck for a few minutes. Because

6

he was too drunk to drive, he decided to ask Krajnak if he could stay at her apartment that night.  He also hoped to salvage the evening and that something might happen between them.  Tschida drove back toward Dirk's, parked near Krajnak's apartment building, and waited for her to leave the bar.

When Tschida saw Krajnak walking from the bar, he got out of his truck and approached her.  He told her he was too drunk to drive and asked if he could stay with her.  She replied: "Yeah, fucking right.  I only wanted you to come out and buy me drinks."  She also said she did not have anyone else to hang out with and was bored.  As he pulled his hands from his zip-up hooded sweatshirt, Tschida knocked the gun out of the front of his pants.  He bent down, picked the gun up, and then "snapped," shooting Krajnak in the head.  He "freaked out" when he saw blood everywhere and realized he had killed her.  He did not call 911 because he thought she was dead.  He went back to his truck, but remembered he had handled Krajnak's electronic tablet earlier that night.  He drove his truck and parked near her body.  He rolled her onto her back, took her tablet from her hand, wiped it clean of fingerprints, and then fled.  He drove to his home, packed up everything of value, including his dog, guns, ammunition, money, and a tent.  He drove north without much of a plan and ultimately decided to go to his family's home in Oregon.  Although he had suicidal thoughts, he decided not to kill himself because of his dog.  The day after arriving in Oregon, he tossed his gun into the Willamette River.  His parents took him to the V.A. hospital in Portland and checked him into the mental health unit.

Tschida denied he went to Krajnak's apartment with the intent to kill her.  He snapped because of her statements about only wanting him to buy her drinks and because she had no one else to hang out with.

The jury found Tschida guilty of first degree murder and found true the related allegations.  The trial court sentenced him to life in prison without the possibility of parole, plus 25 years to life.  Tschida timely filed a notice of appeal.

DISCUSSION

I

*Instruction with CALCRIM No. 625 on Voluntary Intoxication*

Tschida contends the trial court erred by instructing with CALCRIM No. 625 on voluntary intoxication without modifying it to address the lying in wait allegations.

A

At trial, the prosecution had two theories for Tschida's commission of first degree murder, namely that (1) the murder was willful, deliberate, and premeditated, and (2) the murder was committed while lying in wait or immediately thereafter.  Lying in wait was also alleged as a special circumstance of the murder.

During trial, the trial court discussed with counsel its proposed jury instructions, indicating it would give the instructions as presented in the packet it gave counsel unless counsel objected or expressed a need to discuss an instruction.  The prosecutor stated he had included CALCRIM No. 625 to instruct on intoxication in homicide cases.  Tschida's counsel stated an instruction on voluntary intoxication, either CALCRIM No. 625 or No. 3426, should be given, explaining the latter instruction was simpler.  He argued

8

CALCRIM No. 3426 dealt with the issue of specific intent, which was involved in almost all of the charges against Tschida, including the lying in wait allegation. He argued: "I want to make sure it's clear that it [i.e., voluntary intoxication] can be used for all of those. [CALCRIM No.] 3426 actually has it broken down that way. It goes down and actually goes to the charge and then it goes to specific intent." The court replied: "Well, [CALCRIM No.] 625, however, specifically is asking for intoxication for homicide cases." Tschida's counsel then stated: "*That's fine*. We will stick with that." (Italics added.)

The trial court instructed the jury on the prosecution's two theories of first degree murder and instructed on the lying in wait theory, stating:

> "The defendant is guilty of first degree murder if the People have proved that the defendant murdered while lying in wait or immediately thereafter. The defendant murdered by lying in wait if: [¶] 1. He concealed his purpose from the person killed; [¶] 2. He waited and watched for an opportunity to act; [¶] and [¶] 3. Then, from a position of advantage, he intended to and did make a surprise attack on the person killed.
>
> "Lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation and premeditation.
>
> "A person can conceal his purpose even if the person killed is aware of the person's physical presence. [¶] The concealment can be accomplished by ambush or some other secret plan."

The court then instructed with CALCRIM No. 625 on voluntary intoxication, stating:

> "You may consider evidence, if any, of voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation.

9

"A person is voluntarily intoxicated if he becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it can produce an intoxicating effect, or willingly assuming the risk of that effect.

"You may not consider evidence of voluntary intoxication for any other purpose."[4]

The court also instructed with CALCRIM No. 728 on the special circumstance of murder committed while lying in wait.

In closing argument, Tschida's counsel stated the jurors had been instructed on voluntary intoxication, which they could consider for a limited purpose. Because there was evidence Tschida drank a lot the night of the incident and was very intoxicated, his counsel argued the jury could consider his intoxication on the issue of whether he had the intent to kill or acted with deliberation or premeditation. He also argued voluntary

---

4    In comparison, CALCRIM No. 3426, which was not given by the court, states: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted [or failed to do an act] with *<insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that . . .' or 'the intent to do the act required'>*. [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] In connection with the charge of *<insert first charged offense requiring specific intent or mental state>* the People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with *<insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that . . .'>*. If the People have not met this burden, you must find the defendant not guilty of *<insert first charged offense requiring specific intent or mental state>*. [¶] *<Repeat this paragraph for each offense requiring specific intent or a specific mental state.>* [¶] You may not consider evidence of voluntary intoxication for any other purpose. [Voluntary intoxication is not a defense to *<insert general intent offense[s]>*.]"

10

intoxication also affected the issue of lying in wait, which requires a state of mind equivalent to deliberation and premeditation.

B

"[T]he trial court normally must, even in the absence of a request, instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case." (*People v. Carter* (2003) 30 Cal.4th 1166, 1219.) A court has a duty to instruct on a defendant's theory of defense if there is substantial evidence to support that defense. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 669 (*San Nicolas*).) However, voluntary intoxication is *not* a defense. (*Ibid.*) Rather, a defense theory of voluntary intoxication is "an attempt to raise a reasonable doubt as to a specific element of the crime and [does] not trigger a judge's sua sponte duty to instruct." (*Id.* at p. 670.) Evidence of intoxication is "relevant only to the extent that it bears on the question of whether the defendant actually had the requisite specific mental state." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) Accordingly, "the burden falls on the defendant to request a 'pinpoint' instruction [on voluntary intoxication]." (*San Nicolas*, at p. 669.) "[A]n instruction on voluntary intoxication, explaining how evidence of a defendant's voluntary intoxication affects the determination whether defendant had the mental states required for the offenses charged, is a form of pinpoint instruction that the trial court is not required to give in the absence of a request." (*People v. Bolden* (2002) 29 Cal.4th 515, 559.) "[S]uch a pinpoint instruction does not involve a 'general principle of law' as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court." (*Saille*, at p. 1120.)

11

The People assert, and we agree, that Tschida forfeited or waived any instructional error by the trial court because he did not object to CALCRIM No. 625 or request modification of CALCRIM No. 625 to address the lying in wait theories of first degree murder and the special circumstance allegation. (Cf. *San Nicolas*, *supra*, 34 Cal.4th at p. 669 [defendant forfeited any instructional error by not objecting below and instead approving modified instruction]; *People v. Lee* (2011) 51 Cal.4th 620, 638 [failure to request clarification of an otherwise correct instruction forfeits claim of error].) As discussed above, when the trial court discussed its proposed jury instructions with counsel, Tschida's counsel stated an instruction on voluntary intoxication, either CALCRIM No. 625 or No. 3426, should be given and asserted CALCRIM No. 3426 was simpler. He argued CALCRIM No. 3426 dealt with the issue of specific intent, which was involved in almost all of the charges against Tschida, including the lying in wait allegation. He argued: "I want to make sure it's clear that it [i.e., the voluntary intoxication instruction] can be used for all of those. [CALCRIM No.] 3426 actually has it broken down that way. It goes down and actually goes to the charge and then it goes to specific intent." The court replied: "Well, [CALCRIM No.] 625, however, specifically is asking for intoxication for homicide cases." Tschida's counsel then stated: "*That's fine. We will stick with that.*" (Italics added.)

Based on the record, it is clear Tschida's counsel did not object to CALCRIM No. 625 or request its modification or replacement with CALCRIM No. 3426 and instead expressly agreed with the court's proposed use of CALCRIM No. 625 to address the issue

of voluntary intoxication. By stating, "[t]hat's fine," his counsel expressly agreed with the court's proposed use of CALCRIM No. 625. By further stating, "[w]e will stick with that," his counsel also implicitly agreed with the form of CALCRIM No. 625 proposed by the court without any modification. Therefore, Tschida forfeited or waived any error by the court in instructing with CALCRIM No. 625 on voluntary intoxication. (Cf. *San Nicolas*, *supra*, 34 Cal.4th at p. 669; *People v. Lee*, *supra*, 51 Cal.4th at p. 638.)

Contrary to Tschida's assertion, his counsel's initial suggestion that CALCRIM No. 3426 may be the simpler instruction did not constitute an objection to the court's proposed use of CALCRIM No. 625. Likewise, to the extent his counsel argued the instruction on voluntary intoxication, whether with CALCRIM No. 625 or 3426, should apply to both specific intent and the lying in wait allegation, he forfeited or waived any objection to the form of CALCRIM No. 625, as proposed and given by the court, which did not include any reference to lying in wait. Because voluntary intoxication is not a defense, an instruction on voluntary intoxication is a pinpoint instruction that must be requested by the defendant. (*People v. Bolden*, *supra*, 29 Cal.4th at p. 559.) Therefore, Tschida had the obligation to request a specific instruction on voluntary intoxication. (Cf. *People v. Shoals* (1992) 8 Cal.App.4th 475, 490 [when court generally instructs on a point, defendant must request a more specific instruction or be deemed to have waived any error]; *People v. Beeler* (1995) 9 Cal.4th 953, 983 ["In the absence of a request, . . . a trial court is under no obligation to amplify or explain an instruction."].) Furthermore, because he did not request clarification of the court's proposed form of CALCRIM No. 625 to include its application to lying in wait, he is deemed to have forfeited or

13

waived any error in that instruction as given by the court. (*People v. Loza* (2012) 207 Cal.App.4th 332, 349-350.)

Furthermore, contrary to Tschida's assertion, CALCRIM No. 625, as given by the court, was a correct statement of law, indicating the jury could consider evidence of his voluntary intoxication in determining whether he acted with the intent to kill or with deliberation and premeditation. The absence of language indicating evidence of voluntary intoxication could also apply to the jury's consideration of the lying in wait allegations did not make CALCRIM No. 625, as given by the court, either an incomplete or incorrect statement of the law. Although Tschida argues CALCRIM No. 625, as given by the court, erroneously precluded the jury from considering evidence of voluntary intoxication on any issue other than specific intent or deliberation and premeditation (e.g., jury could not consider evidence of voluntary intoxication on issue of lying in wait), he forfeited or waived any such error by not objecting to the court's form of CALCRIM No. 625 and/or not requesting an appropriate modification to that pinpoint instruction to include its application to the lying in wait allegations. (*People v. Beeler*, at p. 983; *People v. Loza*, at pp. 349-350.) Likewise, Tschida forfeited or waived any constitutional due process claim based on the court's instruction with CALCRIM No. 625 by his failure to object to that instruction on that ground. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880-881.)

D

Assuming arguendo Tschida did not forfeit or waive the trial court's purported error by instructing with CALCRIM No. 625, we nevertheless conclude that purported

14

instructional error was harmless. In determining whether an erroneous instruction on voluntary intoxication had a prejudicial effect, we apply the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), and reverse the judgment only if the defendant shows it is reasonably probable he or she would have obtained a more favorable verdict absent the error based on the entire cause, including the evidence.[5] (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134-1135; *People v. Moye* (2009) 47 Cal.4th 537, 541; *People v. Breverman* (1998) 19 Cal.4th 142, 178; *People v. Thomas* (2007) 146 Cal.App.4th 1278, 1289-1290.)

Based on our review of the evidence, we conclude it is not reasonably probable Tschida would have obtained a more favorable verdict had the trial court instructed that its instruction on voluntary intoxication also applied to the jury's consideration of the lying in wait allegations. Although there was some evidence on which the jury could have inferred Tschida was somewhat inebriated (e.g., he had five or six alcoholic drinks), the evidence of his actions before, during, and after his shooting of Krajnak provided strong, and even overwhelming, evidence that he was not so intoxicated that he did not lie in wait before shooting her. Assuming he realized he was too intoxicated to drive

---

5       To the extent Tschida asserts the judgment must be reversed unless the People show the error is harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24, he does not cite any apposite case holding that standard applies, and does not otherwise persuade us that standard for prejudice for federal constitutional error should apply. Furthermore, Tschida does not persuade us that the trial court's purported instructional error resulted in a violation of his federal constitutional right to due process, including a meaningful opportunity to present a complete defense. (*California v. Trombetta* (1984) 467 U.S. 479, 485 [14th Amend. requires that criminal defendants be given a meaningful opportunity to present a complete defense].)

home after leaving the bar that night, Tschida successfully drove his truck to the parking lot near Krajnak's apartment and waited in the dark until she left Dirk's. Tschida's memory of the incident, as shown by his testimony at trial, was quite specific. He testified he removed his hands from his sweatshirt's pockets, causing his handgun to be dislodged from his waistband and drop to the ground. He recalled Krajnak's statements to him that made him "snap" when he picked up his gun and shot her in the head. Importantly, after getting into his truck to leave, Tschida had the presence of mind to remember he had handled Krajnak's electronic tablet that night and returned to her critically injured body. He wiped her tablet clean of fingerprints, including his own, that could inculpate him in the shooting. He then drove home, packed all of his valuable property, including his dog and guns, into his truck, and starting driving north. He successfully drove virtually nonstop for about 18 hours and arrived at his family's home in Oregon over 1,000 miles away. He also had the presence of mind to disable his cell phone to prevent police from tracking him.

Based on that evidence, we conclude it is not reasonably probable the jury would have found Tschida was so intoxicated that, had it been instructed it could consider voluntary intoxication on the issue of lying in wait, it would have found he did not conceal his purpose from Krajnak, did not wait and watch for an opportunity to act, and/or did not, from a position of advantage, intend to and did make a surprise attack on her. On the contrary, the evidence of Tschida's actions was overwhelming that he was not so intoxicated that he did not lie in wait for Krajnak. Even had the court instructed

16

that voluntary intoxication could be considered in determining the lying in wait allegations, it is reasonably probable he would not have obtained a better result.

Furthermore, because we conclude that purported error was harmless, it necessarily could not have affected Tschida's substantial rights under section 1259.[6] Therefore, contrary to his assertion, he cannot raise that issue on appeal despite his failure to object below to CALCRIM No. 625 or request its modification. (*People v. Franco* (2009) 180 Cal.App.4th 713, 720; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

E

Tschida asserts that if he forfeited or waived the trial court's purported error by instructing with CALCRIM No. 625 on voluntary intoxication without modifying that instruction to apply to the lying in wait allegations, he was denied his constitutional right to effective assistance of counsel. He argues his counsel performed deficiently by not objecting to the court's instruction with CALCRIM No. 625 and not requesting modification or clarification of that instruction so that it would apply to the lying in wait allegations, and his counsel's deficient performance was prejudicial.

A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*); *People v. Pope* (1979) 23 Cal.3d 412, 422 (*Pope*).) To show denial of the right to counsel, a defendant must show: (1) his or her counsel's

---

6    Section 1259 provides: "The appellate court may also review any instructions given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

17

performance was below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*); *Pope*, at p. 425.)  To show prejudice, a defendant must show there is a reasonable probability that he or she would have received a more favorable result had his or her counsel's performance not been deficient.  (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.)  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the [trial counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt."  (*Strickland*, at p. 695.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*People v. Williams* (1997) 16 Cal.4th 153, 215.)  It is the defendant's burden on appeal to show that he or she was denied effective assistance of counsel and is entitled to relief. (*Ledesma*, at p. 218.)

"In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and we accord great deference to counsel's tactical decisions.  [Citation.] . . .  Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' "  (*People v. Frye* (1998) 18 Cal.4th 894, 979-980.)

However, a court need not address the issue of whether a defendant's counsel performed deficiently before it addresses the issue of whether the defendant was

18

prejudiced by that purported deficient performance. "If it is easier to dispose of an ineffectiveness claim on the ground of a lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697; see *In re Alvernaz* (1992) 2 Cal.4th 924, 945.)

Assuming arguendo Tschida's counsel performed deficiently as Tschida asserts, we nevertheless conclude he has not carried his burden on appeal to show that deficient performance prejudiced his case. (*Strickland*, *supra*, 466 U.S. at pp. 687, 691-692, 697; *Ledesma*, *supra*, 43 Cal.3d at pp. 216-217; *Pope*, *supra*, 23 Cal.3d at p. 425.) Based on our review of the evidence as discussed in section I(D) above, which discussion we incorporate herein, we conclude it is not reasonably probable Tschida would have obtained a more favorable verdict had his counsel not performed deficiently as Tschida asserts by not objecting to the trial court's instruction with CALCRIM No. 625 and/or not requesting modification of that instruction to apply to the lying in wait allegations. Alternatively stated, our confidence in the outcome of Tschida's trial is not undermined by the purported deficient performance of his counsel. Because Tschida was not prejudiced by his counsel's purported deficient performance, he was not denied his constitutional right to effective assistance of counsel. (*Strickland*, *supra*, 466 U.S. at pp. 687, 691-692, 697; *Ledesma*, *supra*, 43 Cal.3d at pp. 216-217; *Pope*, *supra*, 23 Cal.3d at p. 425.)

II

*Admission of Bad Character Evidence*

Tschida contends the trial court erred by admitting evidence of his bad character in violation of Evidence Code section 1101, subdivision (a).  He argues the court wrongly admitted evidence that (1) he possessed firearms and ammunition other than that used to kill Krajnak, did not have a concealed weapon permit, and used a handgun that did not have an external safety; (2) he received a less than honorable discharge from the Navy; and (3) he used marijuana.  However, he concedes his counsel objected only to admission of evidence of his marijuana use.

A

"Ordinarily a court cannot commit error in the admission of evidence unless it is called upon to *rule* on an *objection* by a party."  (*People v. Viray* (2005) 134 Cal.App.4th 1186, 1208.)  "As a general rule a party objecting to evidence must make a timely and specific objection *in the trial court*."  (*People v. Davis* (2008) 168 Cal.App.4th 617, 627.)  This principle of law is codified in Evidence Code section 353, which states: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice."

20

"In the absence of a timely and specific objection on the ground sought to be urged on appeal, the trial court's rulings on admissibility of evidence will not be reviewed [on appeal]." (*People v. Clark* (1992) 3 Cal.4th 41, 125-126.) Accordingly, "the failure to raise a timely objection forfeits the claim for appeal [citations] . . . ." (*People v. Booker* (2011) 51 Cal.4th 141, 170.) The failure to object on grounds of Evidence Code section 1101, subdivision (a) (i.e., bad character evidence) or Evidence Code section 352 (e.g., unduly prejudicial evidence) forfeits those claims on appeal. (*People v. Medina* (1995) 11 Cal.4th 694, 729 [Evid. Code, § 1101, subd. (a) grounds]; *People v. Gurule* (2002) 28 Cal.4th 557, 626 [Evid. Code, § 352 grounds].)

Because Tschida, as he concedes, did not timely object to admission of evidence regarding his possession of firearms and ammunition other than that used to kill Krajnak, lack of a concealed weapons permit, use of a handgun that did not have an external safety, and less than honorable discharge from the Navy, we conclude he forfeited or waived any error by the trial court in admitting that evidence, whether on Evidence Code section 1101, subdivision (a), grounds or other grounds, and cannot now raise it on appeal. (*People v. Clark*, *supra*, 3 Cal.4th at pp. 125-126; *People v. Booker*, *supra*, 51 Cal.4th at p. 170; *People v. Medina*, *supra*, 11 Cal.4th at p. 729.)

B

By objecting to admission of evidence of his marijuana use, Tschida preserved for appeal his claim of erroneous admission of that evidence, but we nevertheless conclude the trial court did not abuse its discretion to the extent it admitted that evidence. On cross-examination, the prosecutor asked Tschida whether it was correct he received a less

than honorable discharge from the Navy "because of your marijuana use while you were employed by the U.S. Navy as a helicopter mechanic." Tschida's counsel objected and the court instructed the prosecutor to "move on to a different topic." Tschida later confirmed that on January 2 or 3, 2013, a Navy form showed his discharge was less than honorable. The prosecutor asked him whether that was "for drug use." Tschida's counsel objected and the court sustained his objection, instructing him to move to a new topic. The prosecutor later asked Tschida whether he continued his marijuana use after he left the Navy and worked for a private company repairing Navy helicopters. Tschida answered: "I used occasionally." The prosecutor then asked him: "Not only did you use, but you texted about your use, is that correct?" Tschida's counsel objected and the court sustained his objection. The prosecutor asked Tschida: "You had a bong at your house?" His counsel objected and the court implicitly sustained that objection, instructing the prosecutor he should ask "no further questions regarding marijuana use."

Contrary to Tschida's assertion, we conclude the trial court properly admitted evidence on the nature of Tschida's discharge from the Navy. Because Tschida testified on direct examination regarding his eight years of service in the Navy, including time served in Iraq, the prosecutor's questions on cross-examination were relevant to discredit Tschida's apparent portrayal of himself as an upstanding citizen who served his country in the Navy. (*People v. Mayfield* (1997) 14 Cal.4th 668, 755 [permissible scope of prosecutor's cross-examination is wide].) Therefore, to the extent the trial court sustained Tschida's objections to those questions but did not expressly strike his answers, the court properly admitted that evidence as relevant to impeach his credibility. For the same

22

reasons, the court also did not err when it sustained Tschida's objections to the prosecutor's questions about marijuana use after Tschida was discharged from the Navy.

C

In any event, assuming arguendo the trial court erred by admitting evidence of Tschida's marijuana use during and after his service in the Navy, we conclude those errors were harmless under the *Watson* standard of prejudice. " '[A]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights.' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1229.) Accordingly, when a trial court errs in its application of rules of evidence and erroneously admits evidence, we apply the *Watson* standard of prejudice in determining whether the judgment should be reversed. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1093.) Under that standard, we determine whether it is reasonably probable a result more favorable to the defendant would have occurred in the absence of the error. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Based on our review of the evidence, we conclude it is not reasonably probable Tschida would have obtained a more favorable verdict had the trial court excluded evidence of his marijuana use. The primary issues at trial were whether Tschida intended to kill Krajnak and whether he did so with deliberation and premeditation and/or by lying in wait. The evidence supports an inference that when Tschida left Dirk's the night of the incident he was angry at Krajnak for statements she made to him. The evidence also supports an inference that either before or shortly after he left Dirk's he formed the plan to retaliate against her. Tschida, with a loaded handgun in his waistband, drove his truck

23

to the parking lot near Krajnak's apartment and waited there in the dark until she left Dirk's. When Krajnak left the bar, he approached her, placed his handgun within inches of her head, and fired the fatal shot. His actions before and during the shooting were strong evidence of his intent to kill Krajnak with deliberation and premeditation and/or by lying in wait. Furthermore, there was strong evidence of his consciousness of guilt. After getting into his truck to leave, Tschida had the presence of mind to remember he had handled Krajnak's electronic tablet that night and return to Krajnak's critically injured body. He destroyed incriminating evidence by wiping her tablet clean of fingerprints that could inculpate him in the shooting. He then fled and drove home, packed all of his valuable property, including his dog and guns, into his truck and started driving north. He drove virtually nonstop for about 18 hours and arrived at his family's home in Oregon over 1,000 miles away. He also disabled his cell phone to prevent police from tracking him. The following day, he disposed of the handgun he used to shoot Krajnak, tossing it into the Willamette River.

Based on that evidence, we conclude it is not reasonably probable the jury would have found Tschida not guilty of first degree murder or not found true the related allegations (i.e., lying in wait special circumstance and personal discharge of firearm causing death allegations) had the trial court not admitted evidence of Tschida's marijuana use. That evidence was not so inflammatory or otherwise prejudicial that it could have caused the jury to convict him of first degree murder, or find the allegations true, based on the marijuana use evidence rather than the overwhelming evidence of his guilt of that offense and the truth of the related allegations. Any error by the trial court in

24

admitting the evidence of Tschida's marijuana use did not cause a miscarriage of justice and was harmless error. (*Watson*, *supra*, 46 Cal.2d at p. 836; *People v. Mendoza*, *supra*, 52 Cal.4th at p. 1093.)

D

Tschida asserts he was denied his constitutional right to effective assistance of counsel when his counsel did not object to admission of evidence that he possessed firearms and ammunition other than that used to kill Krajnak, did not have a concealed weapons permit, used a handgun that did not have an external safety, and received a less than honorable discharge from the Navy. He also asserts his counsel performed deficiently by not requesting that evidence of his marijuana use be stricken after the trial court sustained his objections to the prosecutor's questions on that issue.

As discussed in part I(E) above, to show denial of the right to counsel, a defendant must show: (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defendant. (*Strickland*, *supra*, 466 U.S. at pp. 687, 691-692; *Ledesma*, *supra*, 43 Cal.3d at pp. 216-217; *Pope*, *supra*, 23 Cal.3d at p. 425.) To show prejudice, a defendant must show there is a reasonable probability that he or she would have received a more favorable result had his or her counsel's performance not been deficient. (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.) "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the [trial counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." (*Strickland*, at p. 695.) "A reasonable probability is a probability sufficient to undermine

confidence in the outcome." (*People v. Williams*, *supra*, 16 Cal.4th at p. 215.) It is the defendant's burden on appeal to show that he or she was denied effective assistance of counsel and is entitled to relief. (*Ledesma*, at p. 218.)

Tschida has not carried his burden on appeal to show it is reasonably probable he would have obtained a more favorable result had his counsel objected to the prosecutor's questions on the issues described above and/or requested that his answers to those questions be stricken from the record. First, he does not show the trial court would have sustained his counsel's objections and excluded that evidence had those objections been made. Rather, it appears most, if not all, of that evidence was relevant to Tschida's commission of murder and/or to impeach the credibility of his trial testimony. The evidence of Tschida's possession of firearms and ammunition other than that used to kill Krajnak was relevant to the issues of his intent to kill Krajnak, his deliberation and premeditation in doing so, and his lying in wait for her, and therefore was not inadmissible under Evidence Code section 1101, subdivision (a), as bad character evidence. (Cf. *People v. Smith* (2003) 30 Cal.4th 581, 613-614 [evidence of defendant's possession of gun and ammunition other than that used to commit the crime was admissible to show defendant's state of mind]; *People v. Jablonski* (2006) 37 Cal.4th 774, 821-822; *People v. Young* (2005) 34 Cal.4th 1149, 1183.) Likewise, evidence of his possession of a handgun without an external safety and his lack of a concealed weapon permit was also relevant to the issues of his intent to kill, deliberation and premeditation, and lying in wait. For example, a person with a loaded gun without an external safety presumably can more easily and quickly fire the gun and take and shoot a victim (e.g.,

Krajnak) by surprise after lying in wait.  Similarly, it can reasonably be inferred that a person who carries a handgun in his or her waistband without a concealed weapon permit does that so he or she can more easily take and shoot a victim (e.g., Krajnak) by surprise after lying in wait and not as merely a general practice of carrying a handgun.  The evidence of Tschida's less than honorable discharge from the Navy was relevant to impeach his credibility and therefore also was not inadmissible under Evidence Code section 1101, subdivision (a), as bad character evidence.

Second, even if some or all of the above evidence would have been excluded had his counsel made timely objections, we nevertheless conclude Tschida has not carried his burden on appeal to show it is reasonably probable he would have obtained a more favorable verdict had that evidence been excluded.  As discussed above, the evidence showing Tschida's guilt of first degree murder and the truth of the related allegations was overwhelming.  We refer to our discussion of the evidence set forth in part II(C) above, which we incorporate herein, rather than restate the evidence.  Tschida's actions before, during, and after the shooting were strong evidence of this intent to kill Krajnak with deliberation and premeditation and/or by lying in wait.  Based on that strong evidence, we conclude it is not reasonably probable the jury would have found Tschida not guilty of first degree murder or not found true the related allegations (i.e., lying in wait special circumstance and personal discharge of firearm causing death allegations) had his counsel objected to, and the trial court excluded, the purported "bad character" evidence.  That evidence was not so inflammatory or otherwise prejudicial that it could have caused the jury to convict him of first degree murder, or find the allegations true, based on

27

Tschida's bad character rather than the overwhelming evidence of his guilt of that offense and the truth of the related allegations. Any deficient performance by Tschida's counsel in not objecting to the purported evidence of Tschida's bad character was not prejudicial. Because Tschida has not shown his counsel's purported deficient performance was prejudicial, we need not address the issue of whether his counsel performed deficiently; we conclude he was not denied his constitutional right to effective assistance of counsel. (*Strickland*, *supra*, 466 U.S. at pp. 687, 691-692; *Ledesma*, *supra*, 43 Cal.3d at pp. 216-217; *Pope*, *supra*, 23 Cal.3d at p. 425.)

### III

### *Prosecutorial Error*

Tschida contends the prosecutor committed prejudicial error or misconduct in cross-examining him and misstating the law in closing argument.

### A

In cross-examining Tschida, the prosecutor asked him whether he received a less than honorable discharge from the Navy as a helicopter mechanic because of his marijuana use and whether he continued to use marijuana after his discharge while he was a civilian helicopter mechanic. Although the court sustained his counsel's objections to questions about marijuana use, the prosecutor later asked Tschida about the bong found in his house.

28

Also, during cross-examination, the prosecutor asked Tschida various questions that he now contends were argumentative, abusive, or repetitive.[7]  For example, after asking Tschida three times whether he pulled the gun's trigger, the prosecutor asked him that question a fourth time.  The trial court intervened, stating "he answered the question."  The prosecutor also asked him: "She was [lying] on the street gurgling when you wiped the prints off, correct?"  Tschida answered: "I don't remember whether she was breathing or not.  I was in a panic.  I do remember her [lying] there and a lot of blood."  The prosecutor then asked: "And that's when you dialed 9-1-1?"  Tschida answered: "No, sir.  I presumed her dead. . . ."  The prosecutor stated: "She lived for 10 more minutes, Mr. Tschida."  The trial court sustained the objection of Tschida's counsel on grounds of an argumentative question.

The prosecutor also asked Tschida questions he now asserts were not founded in the evidence, such as whether he had known Krajnak for 36 days, and later arguing in closing he bought guns 37 days before he killed her and had bought a gun for execution.  The prosecutor also asked Tschida whether he could drive to his house from the location of Dirk's in three minutes.  Tschida answered: "I don't know that."  The prosecutor asked him: "Isn't it true, sir, you did not have a firearm upon your person, that you actually drove home to get the gun out of your house?"  Tschida answered: "No, sir."  Tschida

---

[7]     For purposes of our opinion, we need not, and do not, discuss the details of each of the many instances of purported prosecutorial error cited by Tschida because there is a common theme among those alleged instances.

29

now asserts the prosecutor had no evidentiary basis on which to ask the question regarding the time it took to drive from Dirk's to his house.

In closing, the prosecutor referred to instructions he stated were given by the trial court, including CALCRIM No. 361 regarding the failure to explain or deny adverse evidence, and he read the first sentence of that instruction. However, the court had not given that instruction and the prosecutor did not read the entire CALCRIM No. 361 instruction.[8] In so doing, Tschida asserts the prosecutor misstated the law.

B

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) To preserve a claim of prosecutorial misconduct or error, a defendant must timely object and request a curative admonition unless an admonition would not have cured the harm caused by the

---

8    CALCRIM No. 361 states: "If the defendant failed in (his/her) testimony to explain or deny evidence against (him/her), and if (he/she) could reasonably be expected to have done so based on what (he/she) knew, you may consider (his/her) failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

30

misconduct or error.  (*People v. Hinton* (2006) 37 Cal.4th 839, 863; *People v. Earp* (1999) 20 Cal.4th 826, 858.)

Absent a fundamentally unfair trial under the federal Constitution, prosecutorial misconduct or error does not require reversal of the judgment unless it was prejudicial under state law, i.e., it is reasonably probable the defendant would have obtained a more favorable verdict absent the misconduct or error.  (*People v. Bell* (1989) 49 Cal.3d 502, 534, 542 (*Bell*); *People v. Castillo* (2008) 168 Cal.App.4th 364, 386 (*Castillo*); *People v. Crew* (2003) 31 Cal.4th 822, 839.)  If the prosecutorial misconduct or error renders the defendant's trial fundamentally unfair under the federal Constitution, reversal of the judgment is required unless the misconduct or error is harmless beyond a reasonable doubt.  (*Castillo*, at pp. 386-387, fn. 9; *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323-1324 (*Bordelon*).)

A prosecutor's cross-examination of a defendant may be vigorous and the permissible scope of that questioning is wide.  (*People v. Mayfield, supra,* 14 Cal.4th at p. 755; *People v. Cooper* (1991) 53 Cal.3d 771, 822.)  However, "[i]t is misconduct [i.e., error] for a prosecutor to ask a witness a question that implies a fact harmful to a defendant unless the prosecutor has reasonable grounds to anticipate an answer confirming the implied fact or is prepared to prove the fact by other means.  [Citation.] But if the defense does not object, and the prosecutor is not asked to justify the question, a reviewing court is rarely able to determine whether this form of misconduct [i.e., error] has occurred.  [Citation.]  Therefore, a claim of misconduct [i.e., error] on this basis is

waived absent a timely and specific objection during the trial." (*People v. Price* (1991) 1 Cal.4th 324, 481.)

Although a prosecutor is given wide latitude in vigorously arguing the People's case, the prosecutor may not misstate the law. (*Bell, supra,* 49 Cal.3d at p. 538; *People v. Bandhauer* (1967) 66 Cal.2d 524, 529.) The prosecutor "has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper. Opposing counsel may not complain on appeal if the reasoning is faulty or the conclusions are illogical because these are matters for the jury to determine." (*People v. Thomas* (1992) 2 Cal.4th 489, 526.) "It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial. [Citations.] We recognize that the prosecutor 'may vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citations], but the bounds of vigorous argument do not permit appeals to sympathy or passion such as that presented here." (*People v. Fields* (1983) 35 Cal.3d 329, 362-363, fn. omitted.)

"[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Even if an error could not be cured by an admonition to the jury, reversal of a defendant's conviction is warranted only if on the whole record the error resulted in a miscarriage of justice. (*Bell*, *supra*, 49 Cal.3d at p. 535.)

## C

Although Tschida contends the prosecutor erred by improperly cross-examining him and asking him questions that were argumentative, abusive, repetitive, and/or lacking an evidentiary basis, we conclude he forfeited or waived those errors by not timely objecting below to those purported errors on grounds of prosecutorial error and requesting curative admonitions. (*People v. Hinton*, *supra*, 37 Cal.4th at p. 863; *People v. Earp*, *supra*, 20 Cal.4th at p. 858.) Because the record shows Tschida did not object to the challenged cross-examination questions and closing arguments by the prosecutor, he cannot raise on appeal the issue of prosecutorial error. (*Hinton*, at p. 863; *Earp*, at p. 858.)

## D

However, to the extent Tschida did not forfeit or waive any prosecutorial error and/or argues the jury instructions were incorrect and arguably affected his substantial rights as a result of the prosecutor's challenged arguments (§ 1259; *People v. Felix* (2008) 160 Cal.App.4th 849, 857 [defendant need not object to preserve claim of instructional error if it affects his or her substantial rights]), we nevertheless conclude those prosecutorial and instructional errors did not prejudice him and do not require reversal of the judgment. Alternatively stated, assuming arguendo the prosecutor improperly questioned Tschida on cross-examination and/or misstated the law by reading a portion of CALCRIM No. 361, those errors were harmless under either the state or federal standard for prejudicial error.

33

First, we conclude beyond a reasonable doubt the prosecutor's questions in cross-examining Tschida could not have affected the jury's findings on either his guilt or the truth of the related allegations. As discussed above, the evidence in support of the jury's verdict finding Tschida guilty of first degree murder and finding true the lying in wait allegation was overwhelming. The evidence of Tschida's actions before, during, and after the shooting provided strong evidence of his intent to kill Krajnak and deliberation and premeditation and/or lying in wait. Because the purported prosecutorial errors on cross-examination were harmless beyond a reasonable doubt, Tschida was not denied a fundamentally fair trial under the federal Constitution that would require reversal of the judgment. (*Castillo*, *supra*, 168 Cal.App.4th at pp. 386-387, fn. 9; *Bordelon*, *supra*, 162 Cal.App.4th at pp. 1323-1324.)

Second, it is not reasonably likely the jury applied CALCRIM No. 361 in its deliberations despite the prosecutor's erroneous reference to it. (*People v. Rundle* (2008) 43 Cal.4th 76, 149; *People v. Ayala* (2000) 24 Cal.4th 243, 289; *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73 & fn. 4.) In determining that reasonable likelihood, we review the instructions as a whole and the entire record, including arguments of counsel. (*People v. Young, supra,* 34 Cal.4th at p. 1202; *People v. Smithey* (1999) 20 Cal.4th 936, 988.) In this case, the trial court instructed the jury with CALCRIM No. 200 that it must follow the law as the court explains it and to the extent "the attorneys' comments on the law conflict with my instructions, you must follow my instructions." Therefore, to the extent the prosecutor's argument misstated the law as set forth in the court's instructions by referring to a portion of CALCRIM No. 361 (which instruction was not given by the

34

court), we presume the jury followed the court's instructions, disregarded the prosecutor's reference to CALCRIM No. 361, and did not consider CALCRIM No. 361 in its deliberations.

Third, even had the jury considered CALCRIM No. 361 to be part of the court's instructions on the law as the prosecutor argued, our review of the record shows beyond a reasonable doubt the prosecutor's misstatement of the law did not, contrary to Tschida's assertion, contribute to the jury's verdict. The portion of CALCRIM No. 361 cited by the prosecutor stated: "*If* the defendant failed in his testimony to explain evidence used against him, when he reasonably could have been expected to do so, you may consider his failure to explain or deny in evaluating that evidence." (Italics added.) Therefore, that instruction would not apply at all if, as Tschida asserts, there was no evidence that he failed to explain evidence against him when he could reasonably be expected to do so based on what he knew. Alternatively, had there been such evidence, the jury could then have applied that instruction and considered Tschida's failure to explain it in considering that evidence. Contrary to Tschida's assertion, the prosecutor's omission of the remaining portion of CALCRIM No. 361 did not make that instruction misleading or otherwise prejudicial.[9] Therefore, regardless of whether or not there was such evidence, we conclude the prosecutor's misstatement of the law given by the court was harmless

---

[9]     The omitted portion of CALCRIM No. 361 states: "Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

beyond a reasonable doubt and did not deny Tschida a fundamentally fair trial under the federal Constitution that would require reversal of the judgment. (*Castillo*, *supra*, 168 Cal.App.4th at pp. 386-387, fn. 9; *Bordelon*, *supra*, 162 Cal.App.4th at pp. 1323-1324.)[10]

E

Tschida alternatively argues that if he forfeited or waived the prosecutor's errors, he was denied his constitutional right to effective assistance of counsel. However, even had his counsel timely objected to the purported prosecutorial errors discussed above and requested curative admonitions, we nevertheless conclude Tschida has not carried his burden on appeal to show it is reasonably probable he would have obtained a more favorable verdict had his counsel's objections to those purported errors been sustained and curative admonitions been given by the court. As discussed above, the evidence showing Tschida's guilt of first degree murder and the truth of the related allegations was overwhelming. We rely on our discussion of the evidence set forth in part II(C) above, which we incorporate herein, rather than restate the evidence. Tschida's actions before, during, and after the shooting were strong evidence of this intent to kill Krajnak with deliberation and premeditation and/or by lying in wait. Based on that strong evidence, we conclude it is not reasonably probable the jury would have found Tschida not guilty

---

[10]     To the extent the assumed errors involved only state errors, we conclude, based on the same reasoning discussed above, those errors were harmless because it is not reasonably probable Tschida would have obtained a more favorable verdict had those errors not occurred. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

36

of first degree murder or not found true the related allegations (i.e., lying in wait special circumstance and personal discharge of firearm causing death allegations) had his counsel objected to the prosecutor's purported improper cross-examination and misstatement of the law. Those errors were not so inflammatory or otherwise prejudicial that they could have caused the jury to convict Tschida of first degree murder, or find the allegations true, based on those errors rather than the overwhelming evidence of his guilt of that offense and the truth of the related allegations. Accordingly, any deficient performance by Tschida's counsel in not objecting to the purported prosecutorial errors was not prejudicial. Because Tschida has not shown his counsel's purported deficient performance was prejudicial, we need not address the issue of whether his counsel performed deficiently; we conclude he was not denied his constitutional right to effective assistance of counsel. (*Strickland*, *supra*, 466 U.S. at pp. 687, 691-692; *Ledesma*, *supra*, 43 Cal.3d at pp. 216-217; *Pope*, *supra*, 23 Cal.3d at p. 425.)

IV

*Marsden Hearing*

Tschida contends the trial court erred by not holding a *Marsden* hearing when, shortly before the jury returned its verdict, he complained about his counsel's pretrial preparation.

A

After the jury informed the trial court it had reached a verdict but before the jury entered the courtroom, Tschida stated to the court: "I have an objection about my trial because of ineffective assistance of counsel." He explained:

37

"I believe that my attorney was not ready for trial due to the fact that there was . . . a plea bargain on the table until Saturday before the trial. Jury selection started on the third. I was told Saturday that that was denied.

"I believe my attorney was not ready for this trial. He did not bring any witnesses. He did not investigate anything. He didn't bring any video witnesses to show that I never went over to pick up a weapon. Nor did he research Mapquest. It takes five to eight minutes, not three minutes, to get from the bar to my house. [¶] . . . [¶]

"There are things that were impossible that the D.A. used against me. I believe I was not represented fairly."

The court replied: "All right. That's part of the record." The jury then entered the courtroom and returned its verdict.

B

*Marsden* held the defendant was denied his constitutional right to effective assistance of counsel when the trial court denied his midtrial motion to substitute new counsel without giving him an opportunity to explain his reasons for his request. (*People v. Marsden*, *supra*, 2 Cal.3d at pp. 120, 124.) When a *Marsden* motion for new counsel is made, "the inquiry is forward-looking in the sense that counsel would be substituted in order to provide effective assistance in the *future*." (*People v. Smith* (1993) 6 Cal.4th 684, 695.) When a *Marsden* motion is made, substitute counsel should be appointed only when the trial court finds, "in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or

that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." (*Id*. at p. 696.)

In *People v. Sanchez* (2011) 53 Cal.4th 80 (*Sanchez*), the court addressed the circumstances under which a trial court is obligated to conduct a *Marsden* hearing in the context of a criminal defendant's desire to withdraw a guilty or no contest plea. (*Sanchez,* at pp. 83-84.) *Sanchez* held: "[A] trial court must conduct such a *Marsden* hearing only when there is at least some *clear indication* by the defendant, either personally or through counsel, that the defendant wants a substitute attorney." (*Id*. at p. 84, italics added.) Therefore, a court is required to conduct a *Marsden* hearing *only* if a defendant makes " 'some clear indication' " that he or she wants a substitute attorney. (*Sanchez,* at p. 90.)

C

Based on our review of the record, we conclude Tschida did *not* make any " 'clear indication' " that he wanted a substitute attorney to represent him. (*Sanchez*, *supra*, 53 Cal.4th at pp. 90, 93.) As shown by Tschida's statements to the trial court quoted above, he simply expressed his belief that he did not receive effective assistance of counsel because his attorney had not adequately prepared for trial. In so doing, Tschida focused solely on what had happened in the past and before the trial that had recently concluded. When Tschida expressed his dissatisfaction with his counsel's pretrial preparation, the jury was already on its way to the courtroom to return its verdict. There was nothing in Tschida's statements to the court that indicated he believed his counsel was so ineffective that he could not adequately represent him during the taking of the jury's verdict. Absent " 'some clear indication' " by Tschida that he wanted substitute counsel at that stage of the

proceedings, the court did not have any obligation to conduct a *Marsden* hearing. (*Sanchez,* at pp. 90, 93.)  Contrary to Tschida's assertion, the court properly did not hold a *Marsden* hearing after he informed the court of his dissatisfaction regarding his counsel's pretrial preparations.  (Cf. *People v. Richardson* (2009) 171 Cal.App.4th 479, 485 [no *Marsden* hearing required where defendant submitted a postverdict letter requesting a new trial based on ineffective assistance of counsel during trial].)

*People v. Reed* (2010) 183 Cal.App.4th 1137, cited by Tschida, is inapposite to this case and does not persuade us to reach a contrary conclusion.  Furthermore, *Reed* was issued before the California Supreme Court's 2011 decision in *Sanchez*, which disapproved the cases on which *Reed* relied in concluding the defendant was entitled to a *Marsden* hearing.  (*Sanchez*, *supra*, 53 Cal.4th at p. 90, fn. 3.)  *Sanchez* concluded the decisions in *People v. Mejia* (2008) 159 Cal.App.4th 1081 and *People v. Mendez* (2008) 161 Cal.App.4th 1362 "incorrectly implied that a *Marsden* motion can be triggered with something less than a clear indication by a defendant, either personally or through current counsel, that the defendant 'wants a substitute attorney.' "  (*Sanchez*, at p. 90, fn. 3.) Therefore, it is doubtful *Reed*'s holding survives after *Sanchez*.  In any event, *Reed* is factually and legally inapposite to this case.  *Reed* involved a defendant's expressed desire to file a motion for new trial based on ineffective assistance after the defendant had made previous unsuccessful *Marsden* motions for substitute counsel.  (*Reed*, at pp. 1145-1146.)  In those circumstances, *Reed* concluded the defendant had made a clear indication he wanted substitute counsel to represent him in pursuing a motion for new trial.  (*Ibid*.) In this case, Tschida did not make any previous *Marsden* motions, nor did he, or his

counsel, express he wanted substitute counsel to represent him in pursuing a motion for new trial based on ineffective assistance of counsel. In fact, because the jury had yet to return its verdict, his trial had yet to be completed and a motion for new trial was premature. Tschida's preverdict statements presumably did not indicate any desire for a substitute attorney to represent him in moving for a new trial.

Finally, Tschida asserts that, if he did not clearly indicate a desire for appointment of substitute counsel, the trial court nevertheless should have a sua sponte duty, after hearing his complaints about his counsel, to inquire whether he wanted it to determine whether he qualified for new counsel. However, he does not cite any case persuading us the trial court had that duty in the circumstances of this case. We conclude the court was not required to sua sponte inquire whether Tschida wanted it to hold a *Marsden* hearing to determine whether he qualified for new counsel.[11] (Cf. *People v. Gay* (1990) 221 Cal.App.3d 1065, 1070.)

V

*Cumulative Prejudice*

Tschida contends the cumulative prejudicial effect of the trial court's and prosecutor's errors requires reversal of the judgment. However, based on our review of the entire record, we conclude there is no prejudicial error, considered individually or

---

[11] Because we conclude the trial court did not err by not holding a *Marsden* hearing, we need not, and do not, address Tschida's argument that the purported error was prejudicial.

cumulatively, under the federal and state Constitutions. (Cf. *San Nicolas*, *supra*, 34 Cal.4th at p. 670; *People v. Anderson* (2001) 25 Cal.4th 543, 606.)

## DISPOSITION

The judgment is affirmed.


McDONALD, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.